## Westinghouse Electric Supply Co. v. Hendrich Corporation

*Christine McClure*, for plaintiff.
*Jack M. Gornall*, for garnishee.

JULIANTE, *J.*, November 29, 1983 — Westinghouse Electric Supply Co., (WESCO), holder of a

judgment against Hendrich Corporation (Hendrich) garnished an account held by Union Bank & Trust Co., Erie (Union) known as the "Union Bank & Trust Co., H. C. Account" (H. C. Account). Union raises preliminary objections to the garnishment. The court ordered depositions to be taken to ascertain the facts surrounding the creation of the account. We shall dismiss Union's objections.

Our consideration of the evidence presented reveals no genuine issue of fact; rather, there is a dispute as to the inferences to be drawn from the facts. Therefore, we find that we may resolve this dispute as a matter of law.

Union was the first secured creditor of Hendrich pursuant to a loan and security agreement and a pledge of 51 percent of the Hendrich stock. Hendrich became insolvent, and Union decided to "take control 100 percent" (Mayer deposition, p. 7, 8) of the corporation. Union did not liquidate the assets of Hendrich, but rather took control of the day-to-day financial operations of Hendrich. The H. C. Account was established to give Union complete control over the finances of Hendrich. Into the account have gone all proceeds derived from the sale of Hendrich products, and post-takeover creditors of Hendrich have been paid from this account, using a Hendrich account as a "flow through vehicle." (Mayer deposition, p. 22).

In conjunction with its takeover of Hendrich, Union hired consultants, organized a creditor's committee and advanced new funds to Hendrich in an attempt to turn the company around. As part of the resuscitation attempt, Union hired a business consultant to provide management advice and stave off creditors.

Immediately after the takeover, Union would pay creditors of Hendrich direction from the H. C. Account, with Union drafts. This procedure became cumbersome, and was later changed to a system whereby Hendrich would "requisition" funds from Union. Officers of Union would approve or disapprove the requests. When a requisition was approved, the money would be withdrawn from the H. C. Account and placed into a Hendrich account on which checks could be drawn by Hendrich officers.

During this time, no funds from the H.C. Account were applied to interest or principal on the loans from Union to Hendrich.

Union attempted to secure a guarantee from the Farmers Home Administration ("FmHA") for its loan to Hendrich. A conditional commitment was extended by FmHA. When the original conditional commitment was about to expire, Union sought an extension, whereupon FmHA inquired as to the status of WESCO's suit against Hendrich. Union replied that the WESCO obligation would be paid from the proceeds of the sale of specific Hendrich inventory. FmHA extended the expiration of its conditional commitment based on this representation. The inventory was sold and the proceeds deposited in the H. C. Account, but WESCO was not paid. Subsequently, FmHA refused to guarantee the loan. Meanwhile, the H. C. Account was still used to pay creditors other than WESCO.

A myriad of arguments has been presented to the court as to why or why not the H. C. Account is subject to garnishment by WESCO. As we find one of these arguments dispositive, we need not discuss the others.

WESCO argues that it is a third party creditor beneficiary of Union's promise to FmHA that

WESCO would be paid from identified proceeds. This promise was made by Union to secure a benefit to Union — *time*. Union hoped that during the period the conditional commitment was extended it could restore Hendrich to a degree of solvency such that FmHA would guarantee Union's loan to Hendrich and Union thereby could avoid a substantial loss in the event Hendrich folded up completely. FmHA also received a benefit from this arrangement: the WESCO judgment would not impair the solvency of Hendrich, and thus the likelihood that FmHA would have to make good on the eventual guarantee would be diminished.

The Restatement, (Second) of Contracts, §302 states:

§302. Intended and Incidental Beneficiaries

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

The language of this section expands the concept of §133 of the original Restatement of Contracts, which required an actual or supposed duty of the promisee (FmHA) to the third party to create an enforceable right. §302 was approved by our Supreme Court in Guy v. Liederbach, 501 Pa. 47, 459 A.2d 744 (1983).

In the case at bar, the circumstances clearly indicate that FmHA intended WESCO to have the benefit of the promised performance. Doing so would eliminate a stumbling block in the transaction between Union and Hendrich and FmHA, to wit, the threat to Hendrich's solvency posed by WESCO's lawsuit. Further underscoring the intent to benefit WESCO was Union's indentification of the specific proceeds from which WESCO would be paid. The contract thus created by the agreement between Union and FmHA was performed by FmHA in that the conditional commitment was extended from December 31, 1981 to June 30, 1982. Union has not, however, performed its end of the bargain.

Union argues somewhat ingenuously that there were no "net proceeds" from the sale of the inventory in question, and that an implied condition of Union's promise to pay WESCO was that the sales would produce proceeds in excess of that needed to satisfy other obligations of Hendrich arising out of the dishonor of a customer's check. There was no mention of this in Union's offer to pay WESCO in the letter of September 24, 1981. It appears to the court that the sale of this inventory resulted in $16,003.13 over and above necessary closing costs and that $3,151.20 was escrowed pending completion of other work, or a total of $19,154.33 available to Hendrich. Union chose to apply these funds first to overdrafts on the Hendrich account that Union had covered "to preserve the financial integrity of the Hendrich Corporation . . ." (Mayer affidavit, p. 2).

The problem with according primacy to the Hendrich overdrafts, which obviously did impair the financial integrity of Hendrich, is that the WESCO judgment had the same effect, and the promise to FmHA that WESCO would be paid was made for

exactly the same reason: to avoid an adverse change in Hendrich's financial position. (FmHA letter of September 3, 1981). Thus we do not distinguish between the Hendrich obligation to Union and obligation to WESCO.

Nor are we convinced that the funds in H. C. Account were Union funds and not Hendrich funds. Our examination of the facts in this case leads us to the conclusion that Union was acting as a controlling shareholder rather than as a secured creditor. It was empowered to control the affairs of the corporation by virtue of the pledge of 51 percent of Hendrich's stock. The H. C. Account was not used to marshal and liquidate the assets of the corporation as a secured creditor would normally do, but, rather, the account was a control device. To accept Union's interpretation of the facts would require us to accept the fiction that Union continuously seized the proceeds of Hendrich's inventory pursuant to their security agreement and just as continuously made new loans to Hendrich. The only documentation of this seizure/loan/seizure/loan cycle is the record of deposits and withdrawals in the H.C. Account passbook. As further evidence that title to the funds was in Hendrich, we note that the account bore Hendrich's taxpayer identification number and that Hendrich, not Union, declared the interest on the account as income. As no security interest may be had in an "account," 13 Pa. C.S. §91049(k), and Union cites no authority for the proposition that it has a common law right to the account, we cannot sustain this argument. Thus, we find that the H. C. Account was the property of Hendrich, not Union, not subject to or held as security for the Union loan to Hendrich, and therefore properly the subject of garnishment. See, Johnson v. Workingman's Building and Loan, 18 Erie L.J. 77 (1936).

To conclude, then, it is the finding of this court that WESCO was an intended beneficiary of the agreement between Union and FmHA dated September 29, 1981; that the H. C. Account is the property of Hendrich, not Union; that Union has no security interest in the H. C. Account, and that, therefore, the H. C. Account is properly the subject of garnishment to satisfy the WESCO judgment. Accordingly, we enter the following

## ORDER

And now, this November 28, 1983, upon consideration of the preliminary objections of Union Bank, and after review of the pleadings and depositions, said preliminary objections are dismissed.